# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ruben Castillo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 CR 21 - 1 and 2 | **DATE** | 7/28/2003 |
| **CASE TITLE** | USA vs. Francisco Barrera - Martinez and Luis Montes | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 8/5/2003 at 10:00 A.M..

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]    Suppression hearing concluded. Enter Memorandum Opinion and Order. Defendant Montes' motion to suppress is granted in part and denied in part. Defendant Barrera's motion to suppress and motion to quash his arrest are denied. Government's response to Defendant Montes' motion to sever is due on or before 8/1/03. The Court will rule on 8/5/03 at 10:00 a.m. From today's date until 8/5/03 is excluded pursuant to 18 U.S.C. 3161(h)(1)(F) and 18 U.S.C. 3161(h)(8)(A)(B). (X-E and X-T).

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | number of notices | **Document Number** |
| | No notices required. | | | | |
| | Notices mailed by judge's staff. | | | JUL 2 9 2003 | |
| | Notified counsel by telephone. | | | date docketed | 53 |
| ✓ | Docketing to mail notices. | | | | |
| | Mail AO 450 form. | | | | |
| | Copy to judge/magistrate judge. | | | date mailed notice | |
| RO | courtroom deputy's initials | | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | No. 03 CR 21 |
| v. | ) | |
| | ) | Judge Ruben Castillo |
| FRANCISCO BARRERA-MARTINEZ | ) | |
| and LUIS MONTES | ) | |

**DOCKETED**

JUL 2 9 2003

## MEMORANDUM OPINION AND ORDER

Defendants Francisco Barrera-Martinez ("Barrera") and Luis Montes ("Montes")
are charged with knowingly and intentionally possessing a controlled substance with the
intent to distribute in violation of 21 U.S.C. § 841(a)(1). Both defendants have filed
motions to suppress evidence found in Montes' garage and bedroom alleging that the
drugs were obtained through an illegal search and seizure in violation of the Fourth
Amendment. Montes' motion to suppress is granted in part and denied in part. (R. 30-1.)
Because we find that the cocaine seized in Montes' garage was not the result of an illegal
search, we deny Montes' motion to suppress this evidence. (R. 30-1.) However, because
the officers did not have valid consent to search Montes' bedroom and improperly
conducted a protective sweep, we grant Montes' motion to suppress the evidence found
in his bedroom. (R. 30-1.) We also deny Barrera's motion to suppress and his motion to
quash his arrest.[1] (R. 31-1; 31-2.)

---

[1] Barrera also seeks to quash his arrest, (R. 31-2), and to suppress evidence found in his
apartment at 6239 W. 26th Street, (R. 31-1). Barrera, however, makes no substantive
argument to support these motions. Furthermore, because we find that the duffel bag was
properly seized, the search warrant issued for Barrera's apartment pursuant to the seizure
also was proper. Both motions, (R. 31-1; 31-2), are denied.

*53*

## RELEVANT FACTS

On January 10, 2003, three DEA agents, Officers Ken Howard, John Kosmowski, and Special Agent Ken Weidner[2] were conducting surveillance on an unrelated matter at North Riverside Mall in North Riverside, Illinois. (June 6, 2003 Hr'g Tr. at 10.) While conducting the surveillance, Officer Howard noticed defendant Barrera arrive in a "sedan-type" vehicle, briefly enter and exit the mall and then enter a different vehicle, a white GMC Yukon sports utility vehicle. (*Id*. at 10-11.) Based on fifteen years of law enforcement experience and seven years as a DEA officer, Officer Howard recognized this as a "vehicle switch," which drug traffickers commonly use during narcotic transactions to avoid detection by law enforcement. (*Id*. at 60-61.) Officer Howard, along with the two other officers, decided to follow Barrera. (*Id*. at 61.)

The officers followed Barrera to an apartment at 6239 West 26th Street in Berwyn, Illinois. (*Id*. at 45.) Barrera parked his car and entered an alleyway behind the apartment. (*Id*. at 63.) Barrera reappeared from the rear door of the apartment into the alleyway carrying a khaki duffel bag with both arms. (*Id*. at 65.) Barrera then put the duffel bag down and retrieved the Yukon. (*Id*. at 66.) Barrera drove the Yukon into the alley and loaded the duffel bag into the vehicle. (*Id*. at 67.) At one point while Barrera was in the alley, Officer Howard observed him talking on his cell phone. (*Id*. at 69.)

After placing the duffel bag in the Yukon, Barrera drove to an empty parking lot near 26th Street and Ridgeland Avenue and made a telephone call. (*Id*. at 95.) While

---

[2] DEA Special Agent Ken Weidner did not testify at the June 26, 2003 hearing and his whereabouts on January 10 are not clear from the other officers' testimony. Because it appears Agent Weidner did not play any significant role in the events relevant to this motion, the facts set forth here focus primarily on Officers Howard and Kosmowski.

Barrera was on the telephone, Officer Kosmowski saw defendant Montes in a nearby garage located in an alley. (*Id.* at 108.) Barrera then drove to Montes' garage, retrieved the duffel bag from the Yukon and gave it to Montes. (*Id.* at 95.) The duffel bag was approximately half full of something, (*id.* at 12), and contained a drawstring on top, (*id.* at 108). Officer Kosmowski testified that the drawstring at the top of the bag was open. (*Id.*) Montes then took the duffel bag into the garage. (*Id.*) Both sides stipulated that Montes rented the garage and the nearby apartment. (*Id.* at 8.)

Barrera, in the meantime, got into his Yukon and drove away. (*Id.* at 71.) Officer Howard asked Officer Kosmowski to follow Barrera and stop him. (*Id.*) Barrera drove a short distance and parked in an empty parking lot. (*Id.* at 98.) Officer Kosmowski followed and parked directly behind him. (*Id.*) Barrera then exited the Yukon, dropped his keys to the ground, jumped a fence in front of him and fled. (*Id.* at 100.) As Barrera dropped his keys, Officer Kosmowski got out of his vehicle and shouted, "Stop. Police." (*Id.* at 101.) When Barrera continued to flee, Kosmowski radioed the other agents and informed them of Barrera's flight. (*Id.* at 110.) Barrera was subsequently arrested nearby by a Berwyn police officer.[3] (*Id.* at 101.)

Meanwhile, Officer Howard approached Montes' garage. (*Id.* at 18.) Inside, Officer Howard observed two vehicles side by side and Montes standing near a side door of the garage. (*Id.* at 17-18.) Officer Howard announced to Montes that he was a police officer and asked to speak to him. (*Id.* at 18.) There was a question at the suppression

---

[3] The circumstances of Barrera's arrest are not clear. Barrera filed an unsigned affidavit alleging that he thought Officer Kosmowski was a robber and thus sought out the Berwyn police officer voluntarily. The government disputes this portion of Barrera's affidavit but neither side gave testimony on it. (June 23, 2003 Hr'g Tr. at 121.)

hearing as to whether Officer Howard at this point was standing in the alleyway or if he was on the cement apron extending from the garage. (*Id.* at 27.) Officer Howard had previously testified before two grand juries that he was on the apron when he first observed Montes, but he later testified at the June 26, 2003 hearing that he was actually in the alley. (*Id.* at 31-32.) Officer Howard's explanation for this inconsistency was that during the grand jury testimony he was not concerned about being technical regarding his exact location outside of the garage. (*Id.* at 73.)

In response to Officer Howard's request to speak to him, Montes dropped a set of keys he was holding and walked out of the garage. (*Id.* at 28.) Montes was no longer holding the duffel bag. (*Id.* at 19.) At this point, Officer Howard received Officer Kosmowski's radio message informing him of Barrera's flight. (*Id.*) Officer Howard then grabbed the back of Montes' jacket and held him while he performed a visual sweep of the front of the garage by walking from side to side to see if anyone else was present in the garage. (*Id.* at 74.) Officer Howard did not enter the garage. (*Id.* at 19.) Officer Howard saw the duffel bag in the garage while conducting the visual sweep outside the garage doors. (*Id.* at 75.) The bag was lying on its side with the opening facing toward the alley and it looked like it had been thrown down. (*Id.*) Protruding from the opening of the bag was part of a red-tinted brick-shaped package. (*Id.*) Based on Officer Howard's previous experience with narcotics, he believed the package to contain narcotics. (*Id.* at 77-78.)

Officer Howard asked Montes his name, where he lived, if the vehicles in the garage were his and what was in the duffel bag. (*Id.* at 51.) Montes informed him that his name was Luis, that he lived on the second floor of the apartment and that the

vehicles were not his. (*Id.*) When Officer Howard asked what was in the duffel bag, Montes responded "no habla" [sic]. (*Id.*) Officer Howard then placed Montes under arrest and seized the duffle bag. (*Id.* at 27-28.) Officer Kosmowski returned to the garage just after the arrest of Montes and saw the duffle bag from outside the garage. (*Id.* at 102.) Officer Kosmowski also saw part of the brick-shaped package protruding from the bag and concluded that it was likely narcotics. (*Id.* at 112). The seized packages tested positive for cocaine.

Following the seizure, the officers went to the second floor apartment and knocked on the door. (*Id.* at 29.) Manuel Madrigal-Martinez ("Madrigal") answered the door. (*Id.*) Officer Howard identified himself as a police officer and asked if Madrigal lived there and if he knew Montes. (*Id.* at 81.) Madrigal answered yes to both questions. (*Id.*) Officer Howard then informed Madrigal that Montes had been arrested for narcotics and asked if they could come in and look around. (*Id.*) Madrigal again answered yes. (*Id.*)

While Officer Howard stayed with Madrigal, Officer Kosmowski conducted a protective sweep of the apartment to see if anyone else was present. (*Id.* at 82.) The doors to each of the apartment's three bedrooms were open when Officer Kosmowski conducted his sweep. (July 7, 2003 Hr'g Tr. at 152). During the protective sweep, Officer Howard asked Madrigal to whom the nearest bedroom belonged. (*Id.* at 83.) Madrigal indicated that it was Montes' bedroom. (*Id.*) In that bedroom Officer Kosmowski found 500 grams of cocaine and a gun, both lying on a shelf in the closet. (*Id.* at 84.) Officer Howard asked Madrigal who owned the cocaine and gun, to which he responded "no habla" [sic]. (*Id.*) A Spanish-speaking officer was then called in and

Madrigal subsequently signed a consent form to search his room. (*Id.* at 36-37.) Later, another roommate, Yunuen Ochoa, arrived and signed a consent form for the search of his room. (*Id.* at 42.) The only evidence found in the apartment that is at issue in this motion is the gun and cocaine found in Montes' room during the protective sweep by Officer Kosmowski.

Currently before the Court are Defendants Montes and Barrera's motions to suppress the cocaine found in the garage and Montes' motion to suppress the cocaine and gun found in his bedroom. Defendants argue that the searches of the garage and the apartment violated their Fourth Amendment rights against unreasonable searches and seizures. After careful consideration, we grant Montes' motion to suppress the cocaine and gun found in his bedroom and deny his motion to suppress the cocaine found in his garage. We also deny Barerra's motion to suppress the cocaine found in Montes' garage and Barrera's apartment.

## LEGAL STANDARDS

A defendant who seeks to suppress evidence bears the ultimate burden of proof and persuasion in making a *prima facie* showing of illegality. *United States v. Randle*, 966 F.2d 1209, 1212 (7th Cir. 1992). Additionally, the defendant has the burden of establishing that his own Fourth Amendment rights were violated by the challenged seizure. *Id.* To establish an illegal search the defendant must demonstrate a personal expectation of privacy in the place that was searched. *Minn. v. Carter*, 525 U.S. 83, 88 (1998). Reliance on vague, conclusory allegations is insufficient. *Id.* Rather, a defendant must present "definite, specific, detailed, and nonconjectural" facts to justify

relief. *United States v. Hamm*, 786 F.2d 804, 807 (7th Cir. 1986). *See also United States v. Felix-Felix*, 275 F.3d 627, 633 (7th Cir. 2001).

## ANALYSIS

### I. Barrera's Motion to Suppress

Barrera seeks to suppress the five kilograms of cocaine found in the duffel bag in Montes' garage. He has not, however, fulfilled his burden of showing he had an expectation of privacy in either Montes' garage or in the duffel bag itself. To claim the protection of the Fourth Amendment, a defendant must demonstrate a reasonable expectation of privacy in the place that was searched. *Carter*, 525 U.S. at 88. "A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." *Rakas v. Ill.*, 439 U.S. 128, 134 (1978); *Alderman v. United States*, 394 U.S. 165, 174 (1969) ("Fourth Amendment rights are personal rights which . . . may not be vicariously asserted.").

Barrera has no proprietary interest in Montes' garage nor does he allege any special relationship to the garage that would give him an expectation of privacy. *Cf. Minn. v. Olson*, 495 U.S. 91, 100 (1990) (holding that an overnight social guest had an expectation of privacy in the place he was staying). Temporary visitors, such as Barrera, do not develop reasonable expectations of privacy on someone else's property. *Carter*, 525 U.S. at 91 (holding that the defendants who were packaging cocaine at someone else's apartment for a few hours did not have an expectation of privacy in the apartment); *Randle*, 966 F.2d at 1213 (holding that defendant's Fourth Amendment rights were not

violated because he had no expectation of privacy in a friend's apartment). Barrera has not shown that he had any expectation of privacy in Montes' garage.

Barrera has also not shown that he had an expectation of privacy in the duffel bag. Notably absent in Barrera's affidavit is any statement averring that Barrera subjectively had any expectation of privacy in the bag. *See Katz v. United States*, 389 U.S 347, 361 (1967) (stating that a person must first exhibit an actual (subjective) expectation of privacy and, second, the expectation of privacy must be a reasonable one). Even if Barrera did have a subjective expectation of privacy in the duffel bag, it was not a reasonable one. Barrera makes no claim to own the duffel bag and does not allege any proprietary interest in the bag. *See U.S. v. Duprey*, 895 F.2d 303, 309 (7th Cir. 1989) (listing factors to determine whether there is a reasonable expectation of privacy in an area or item), *cert. denied*, 495 U.S. 906 (1990). He also does not show that he had exclusive access to the duffel bag. *Id.* We therefore are left with the fact that he carried the duffel bag from his apartment and gave it to Montes.[4] From all appearances, Barerra gave up any expectation of privacy he may have had in the bag when he gave it to Montes. *See Rawlings v. Kentucky*, 448 U.S. 98, 105 (1980) (defendant who hid drugs in acquaintance's purse had no expectation of privacy; "the precipitous nature of the transaction hardly supports a reasonable inference that petitioner took normal precautions to maintain his privacy"). Because Barrera has not shown that he had a reasonable

---

[4] Barrera alleges that leaving the duffel bag with Montes created a bailment, but fails to point to any facts that would support this finding. Moreover, Barrera's argument rests on his claim that the bag was "obviously" closed. However, we do not find this claim to be as obvious as Barrera does and in fact, find just the opposite. As detailed below, we find that when Officer Howard observed the duffel bag, it was open. Barrera has not fulfilled his burden of showing he had a reasonable expectation of privacy in the duffel bag.

expectation of privacy in Montes' garage or the duffel bag, we find that his Fourth Amendment rights were not violated and thus Barrera's motion to suppress is denied.

## II. Montes' Motion to Suppress

Montes seeks to suppress the five kilograms of cocaine found in the garage as well as the 500 grams of cocaine and the gun found in his bedroom. Because both sides have stipulated that Montes rented the garage and the apartment and thus has a proprietary interest in the property, Montes' motion does not suffer the same defect as Barrera's. For the reasons set forth below, however, we hold that Montes did not have an expectation of privacy in the contents of the duffel bag because the duffel bag was open and in plain view in the garage. Conversely, we hold that Montes did have an expectation of privacy in his bedroom and that the officers violated his Fourth Amendment rights by searching it.

### A. Garage Search

Montes first argues that the cocaine found in the garage must be suppressed because the officers did not have a search warrant to enter the garage. Central to Montes' argument are three premises, all of which must be true for his motion to be granted: (1) garages are protected from warrantless searches under the Fourth Amendment; (2) the apron extending from the garage also falls under the protection of the Fourth Amendment; and (3) Officer Howard was standing on the apron when he observed the package of cocaine in the duffel bag.

Montes' strongest argument lies in his first premise and the government does not dispute that a person may have an expectation of privacy in his garage. *See Taylor v. United States*, 286 U.S. 1, 6 (1932) (holding that agents could not enter garage without a

warrant); *U.S. v. Oaxaca*, 323 F.3d 1154, 1157 (9th Cir. 2000) (holding that a garage is protected by the Fourth Amendment). Assuming that Montes' garage was protected by the Fourth Amendment does not resolve the dispute, however, because Officer Howard did not enter the interior of the garage until after he had seen the package of cocaine partially protruding from the bag.[5] The primary issue then is whether Officer Howard was standing on the apron when he observed the duffel bag, and if he was, whether the apron extending from the garage was protected as part of the garage.

We first address whether Officer Howard was standing on the garage apron or in the alley when he first observed the duffel bag. Officer Howard testified in two previous grand juries that he was standing on the apron. (June 6, 2003 Hr'g Tr. at 31-32.) He acknowledged that he understood the distinction between the alley and the apron during that grand jury testimony. (*Id.* at 89.) However, Officer Howard testified at the June 6, 2003 hearing that he was actually standing in the alley when he first observed the duffel bag, not the apron. (*Id.*) Officer Howard's explanation of this inconsistency was that in his prior grand jury testimony, he was not concerned about the distinction between the alley and apron. (*Id.* at 73.) We are not entirely persuaded by this explanation, however, and find Officer Howard's testimony self-contradictory at best. We conclude that it is more likely than not that Officer Howard did not keep track of whether he was standing on the apron or in the alley when he observed the duffel bug. However, because we find that the apron was not protected under the Fourth Amendment in this case, we need not

---

[5] Whether Officer Howard reasonably believed the partially protruding package was narcotics is hardly subject to dispute. Officer Howard has fifteen years of law enforcement experience and seven years as a DEA officer; based on the suspicious circumstances and his experience in drug enforcement, we do not doubt that Officer Howard reasonably believed the brick-shaped package contained narcotics.

definitively decide whether Officer Howard was on the apron or in the alley when he observed the package of cocaine.

The relevant question in determining whether an area, in this case the garage apron, falls under the protected curtilage of a home is "whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *United States v. Dunn*, 480 U.S. 294, 301 (1987). Four factors have been used to determine whether an area should be considered part of a home's protected curtilage: (1) the proximity of the area to the home; (2) whether the area is included within an enclosure surrounding the home; (3) the nature of the uses to which the area is put; and (4) the steps taken by the resident to protect the area from observation by passersby. *Id*. at 301. The Supreme Court in *Dunn*, for example, held that the area surrounding a barn was not protected because it was some distance from the house, the area was not enclosed and the defendant did little to protect the area from observation. *Id*. at 302-303. Thus, police officers did not violate the defendant's Fourth Amendment rights by standing on the area near the open barn and looking into the barn's interior. *Id*. at 305.

We find this same analysis applies to the apron extending from Montes' garage. The only factor that favors finding the apron to be protected is its proximity to the garage, which we have assumed is protected. However, proximity to the home is not alone sufficient to qualify the area for Fourth Amendment protection. *See United States v. French*, 291 F.3d 945, 952 (7th Cir. 2002) (stating that the proximity of the area to the house does not alone establish that the area is within the home's curtilage, but is just one of the factors to be considered). In this case, the other three factors weigh against finding

a reasonable expectation of privacy in the garage apron. The apron is not enclosed in any way and in fact naturally adjoins a public alleyway. Anyone walking in the alley can observe what is happening on the apron. Additionally, Montes made no effort to conceal the apron from outside observation, although this is not unusual because garage aprons are not normally used for intimate activities of the home and thus are not normally enclosed.

The circumstances of the encounter also support our finding that the garage apron is not protected by the Fourth Amendment in this case. When Officer Howard saw the suspicious delivery of the duffel bag, he approached Montes' garage. The garage was open and the apron and interior of the garage could easily be observed from the alley. Any visitor who wanted to talk with someone in an open garage would naturally go to the garage apron to get the person's attention. This is analogous to going up someone's front steps to knock on the door. Where the circumstances would invite a visitor to use normal means such as a porch, pathway or front steps to pay a visit or talk to the owner of the property, there is no expectation of privacy in those paths. *See French*, 291 F.3d at 954 (reasonable for an officer to walk up gravel driveway and walkway to talk to defendant working on car outside); *United States v. Morrow*, 541 F.2d 1229, 1232 (7th Cir. 1976) (no violation of Fourth Amendment where officer walked up driveway and looked in garage door window), *cert. denied*, 430 U.S. 933 (1977); *United States v. Daoust*, 916 F.2d 757, 758 (1st Cir. 1990) (a policeman seeking to talk to the occupant of a home may follow a path to the rear of the house to try and find someone home); *Davis v. United States*, 327 F.2d 301, 303 (9th Cir. 1964) (stating there is no rule making it illegal to

openly and peaceably walk up the steps of a man's home with the intent of asking him some questions, even if that someone is an officer of the law).

We opine that the current situation is similar to the circumstances in *United States v. Conner* where the officers, responding to a tip regarding illegal activity, went to the defendant's garage to ask him some questions.[6] *Conner*, 478 F.2d 1320, 1322-1323 (7th Cir. 1973). The garage had an apron near an alleyway and from both the alley and apron, the officers could see into the interior of the garage where the officers observed that a car was being taken apart. *Id.* at 1322. The court found that the defendants in the garage had no reasonable expectation of privacy and that "even if the officers were on the apron, which was not fenced off from the alley, we think that a mere 'technical trespass' did not transform an otherwise reasonable investigation into an unreasonable search." *Id.* at 1323. Officer Howard's actions in approaching Montes and asking him to come out of the garage for questioning were reasonable in light of the suspicious circumstances of the vehicle switch and the duffel bag transaction. Because Officer Howard merely did what most visitors would have done to talk with Montes, and because the apron was open and observable to the public, we find it was not within the protected curtilage of Montes'

---

[6] Montes relies heavily on *Payton v. New York*, which held that a warrantless search of a home is presumptively unreasonable. *Payton*, 445 U.S. 573, 586 (1980). Montes intimates that this holding from *Payton* limited or overruled *Conner*. In reality, *Payton* and *Conner* are entirely consistent. *Payton* dealt with warrantless entries into the home while *Conner* addressed whether pathways are protected as part of a home under the Fourth Amendment. The principle from *Conner* that certain areas such as pathways and driveways do not always have Fourth Amendment protection is not inconsistent with the *Payton* holding. If a pathway is not part of a home, then *Payton* does not apply. This is consistent with subsequent holdings such as *United States v. French*, where the Seventh Circuit held that the gravel pathway of a home was not protected under the home's curtilage. *French*, 291 F.3d at 954.

garage. Thus, if Officer Howard did in fact step onto the apron, he did not violate Montes' Fourth Amendment rights.[7]

Having found that Officer Howard viewed the duffel bag from an area not protected by the Fourth Amendment, the plain view doctrine then allowed Officer Howard to retrieve the cocaine. *See United States v. Rivera*, 825 F.2d 152, 157 (7th Cir. 1987), *cert. denied*, 484 U.S. 979 (1987). In making this finding, the Court specifically credits Officer Howard's testimony that the duffel bag was open and that one of the packages of cocaine was partially showing. We believe that what likely happened is that when Officer Howard pulled up to the garage to talk with Montes, Montes was surprised by the officer's unexpected arrival and dropped or threw down the bag. The bag then fell on its side facing the garage entrance and the packages of cocaine fell forward leaving one of the packages exposed to plain view. Based on Officer Howard's experience, he immediately recognized the brick-shaped package as narcotics.

Discovering the narcotics in plain view, however, does not itself justify Officer Howard entering the garage and seizing the duffel bag. In addition to seeing the narcotics in plain view, Officer Howard must also have had a lawful right of access to the duffel bag. *See Horton v. Cal.*, 496 U.S. 128, 137 (1990) ("not only must the officer be lawfully located in a place from which the object can be plainly seen, but he or she must also have

---

[7] Additionally, we find that the duffel bag and cocaine package were visible from the public alleyway as well as the apron. The time was 3:45 in the afternoon and Officer Howard testified that there was plenty of sunlight to see into the interior of the garage. (June 26, 2003 Hr'g Tr. at 87.) The duffel bag was approximately five feet, (*id.* at 103), from the garage opening and there were no shadows being cast on the bag from the vehicles in the garage, (*id.* at 87). Because the contents of the duffel bag were in plain view of the public alleyway, this further supports the finding that Montes had no expectation in the privacy of the duffel bag.

a lawful right of access to the object itself"). While Officer Howard viewed the duffel bag from a lawful vantage point, this alone did not give him the authority to enter Montes' garage without exigent circumstances. *See Payton*, 445 U.S. at 585-86 (warrantless entries into homes are presumptively unreasonable).

One exigent circumstance arises when an officer objectively believes that evidence may be destroyed or removed before a warrant can be secured. *See United States v. Rivera*, 248 F.3d 677, 680 (7th Cir. 2001), *cert. denied*, 534 U.S. 923 (2001); *United States v. Robles*, 37 F.3d 1260, 1263 (7th Cir. 1994) (exigent circumstances existed to enter home and seize incriminating evidence in plain view out of fear that evidence would be destroyed). Another exigent circumstance occurs when an officer has reason to fear for his own safety or the safety of another. *United States v. Brown*, 64 F.3d 1083, 1086 (7th Cir. 1995).

We find that Officer Howard reasonably believed exigent circumstances required him to seize the cocaine.[8] Officer Howard had just interrupted a narcotics transaction. The number of persons involved was unknown and at least one suspect, Barerra, had not been placed in custody. From Officer Howard's experience in narcotics, he knew that narcotics transactions could be dangerous. (July 7, 2003 Hr'g Tr. at 157.) He was in an unfamiliar alley with a duffel bag containing cocaine packages sitting in plain view in the

---

[8] Officer Howard did not create exigent circumstances as argued by Montes. Lawfully investigating suspicious activity does not indicate that the officer is manufacturing exigent circumstances. *See United States v. MacDonald*, 916 F.2d 766, 772 (2d Cir. 1990) (holding that when law enforcement agents act in an entirely lawful manner, they do not impermissibly create exigent circumstances). Officer Howard lawfully approached Montes from a public alleyway and inquired about Montes' suspicious activities. Officer Howard's lawful actions did not illegally manufacture the exigent circumstances that led to the seizure of the cocaine.

garage. We find that Officer Howard's belief that exigent circumstances required him to seize the bag of cocaine out of fear for his own safety and for the security of the evidence was reasonable. (*Id.*) This finding is further supported by Officer Howard's limited intrusion into the garage. Officer Howard merely walked into an open garage to seize the duffel bag of cocaine that was sitting in plain view. Officer Howard's actions were reasonable under the circumstances.[9]

Finally, because we find that the discovery of the cocaine was not a result of Montes' detention but was in plain view, we need not address whether or not his detention was valid. Where an officer would have discovered the evidence independently of any illegal actions, the evidence will not be excluded. *See Murray v. United States*, 487 U.S. 533, 539 (1988); *Nix v. Williams*, 467 U.S. 431, 448 (1984) (stating that where the evidence would have been discovered without the police error or misconduct, the evidence is admissible). We find the current facts analogous to those in *United States v. Willis*, where a police officer made an investigatory stop of the defendant near a vehicle and observed a gun inside the car. *Willis*, 37 F.3d 313, 316 (7th Cir. 1994). The defendant argued that his detention was illegal and that the gun found in the car should be suppressed. *Id.* at 315. The court rejected this argument stating that even if the initial stop was unjustified, the officer "did not need to rely on the investigative stop to attain

---

[9] Montes argues that the better course of action for Officer Howard would have been to secure the scene and obtain a search warrant for the garage. While this alternative may have been preferable, the relevant inquiry for suppression is whether Officer Howard reasonably believed that exigent circumstances required the immediate seizure of the cocaine. *See Rivera*, 248 F.3d at 680. We find that Officer Howard's belief that the circumstances warranted seizure was reasonable and thus uphold the seizure of the cocaine. *See Brown*, 64 F.3d at 1086 ("An officer on the beat must be allowed latitude to make snap judgments, subject to the requirement of reasonableness").

the position from which he plainly viewed the gun." *Id.* at 316. Such is the case here.

Officer Howard would have been in a position to view the cocaine even without detaining

Montes and thus the detention does not affect the discovery of the cocaine.[10]

## B. Apartment Search

The government offers two bases to uphold the search that uncovered a gun and

500 grams of cocaine in Montes' room: (1) an alleged consent from Montes' roommate to

search the apartment; and (2) Officer Kosmowski's protective sweep to check and see if

anyone else was in the apartment. We address the consent issue first.

### 1. Consent

The government argues that Montes' roommate Madrigal consented to a search of

the apartment including the bedrooms. The issues are whether Madrigal had actual or

apparent authority to consent to a search of Montes' bedroom and, if he did, whether

Madrigal understood enough English to give a valid consent for the search. A third party

who has common authority over the premises may consent to a search of the commonly

shared areas in the absence of the non-consenting person. *United States v. Matlock*, 415

---

[10] Although we need not decide the issue, we also find that Officer Howard conducted a valid *Terry* stop. Police officers may stop a person and detain him briefly for questioning upon suspicion that he may be connected with criminal activity. *See Terry v. Ohio*, 392 U.S. 1, 30 (1968). The less intrusive a search, the less justification is required. *Brown*, 64 F.3d at 1086. Under the circumstances, suspicious activity led Officer Howard to briefly detain Montes. Officer Howard observed Barrera make a vehicle switch, a common action in drug transactions, obtain a duffel bag that was half full, make stops to use his cell phone and then meet with Montes to transfer the duffel bag. When Officer Howard approached Montes' garage to question him, Officer Kosmowski radioed Officer Howard that Barrera had fled. These actions were sufficient for Officer Howard to temporarily detain Montes on suspicion of drug activity. Additionally, the intrusiveness of Officer Howard's actions to Montes were minimal. He did not frisk Montes and merely held him in front of him while he checked the garage to see if anyone else was there. *Cf. id.*

U.S. 164, 170 (1974). Common authority rests on "mutual use of the property by persons generally having joint access or control for most purposes." *Id.* at 171 n.7. However, third party consent only applies to those areas of the premises where there is joint control or access. *See United States v. Duran*, 957 F.2d 499, 505 (7th Cir. 1992) (stating that two friends in apartment might reasonably expect to maintain exclusive access to their own bedrooms).

For a valid consent, the roommate must have either actual authority to consent to the search or apparent authority. *See Ill. v. Rodriguez*, 497 U.S. 177, 188-89 (1990). Apparent authority is present when facts available to the officer at the moment of consent would warrant a person of reasonable caution to believe that the consenting party had authority over the premises. *Id.* If the surrounding circumstances make the consenting party's authority questionable, the officer has a duty to inquire further as to the third party's authority. *See id.; Montville v. Lewis*, 87 F.3d 900, 903 (7th Cir. 1996). The government bears the burden of establishing that the third party had the requisite authority to consent to the search or that the officers reasonably believed he did. *See Duran*, 957 F.2d at 503.

Neither side disputes that Madrigal had actual authority to consent to a search of his own room and the common areas of the apartment. The only dispute is whether there was actual or apparent authority to search Montes' bedroom. The government has not offered any evidence indicating that Madrigal had any kind of shared authority over Montes' bedroom. Montes rented the apartment and his name was on the lease. Madrigal was merely renting a room from Montes and there are no facts showing that Madrigal was given any kind of permission to use or access Montes' room.

Where roommates have separate rooms, each roommate presumes that he has exclusive control over his own room. *See United States v. Aghedo*, 159 F.3d 308, 310 (7th Cir. 1998). We therefore think it reasonable to presume that roommates do not have actual authority to consent to a search of another roommate's room unless there are specific facts that would indicate otherwise. *See id.* (two roommates in an apartment might not have authority to consent to a search of the other's room); *United States v. Ladell*, 127 F.3d 622, 624 (7th Cir. 1997) (roommate can at least consent to search of common areas to which he has access). Thus, we find that Madrigal did not have actual authority to consent to a search of Montes' bedroom.

We also find that the circumstances were such that the officers did not reasonably conclude that Madrigal had apparent authority to consent to a search of Montes' room. When the officers entered the apartment, they could clearly see three separate bedrooms. Upon questioning, Madrigal identified one room as Montes' and on his signed consent form, he specifically gave consent to search only his own room. Madrigal gave no indication that he had authority to consent to a search of any bedroom besides his own. Therefore, the officers could not have reasonably believed that Madrigal had authority to consent to a search of all three rooms and once the consent form was signed, they knew they did not have authority to do so. Therefore the officers never had valid consent to search Montes' bedroom.

We also have serious doubts as to whether Madrigal understood enough English to give the officers valid consent to search the apartment. Although he answered a few yes or no questions in English and showed a Mexican identification card upon request, the officers nevertheless felt that Officer Marrero, a Spanish-speaking officer, needed to

be called in to translate. We find it curious that Officer Marrero was never called to testify at the hearing as he undoubtedly could have shed some light on Madrigal's understanding of the consent. However, because we have already found that Madrigal did not have authority to consent to the search of Montes' bedroom and this motion to suppress is relevant only to that evidence found in Montes' bedroom, we need not definitively decide whether Madrigal understood enough English to consent to a search of the apartment or his bedroom.

## 2. Protective Sweep

The government next argues that the cocaine found in Montes' room should not be suppressed because it was discovered during a valid protective sweep. The concept of a protective sweep was first propounded in *Maryland v. Buie* where the Supreme Court defined a protective sweep as a "quick and limited search of [the] premises, incident to an arrest and conducted to protect the safety of police officers and others." *Buie*, 494 U.S. 325, 327 (1990). The Court's reasoning was that when officers are invading a person's home to make an arrest, they may find themselves in dangerous situations and thus are permitted to take reasonable steps to ensure their safety. *Id.* at 333-34. A protective sweep is therefore permissible if the officers have a reasonable belief based on specific and articulable facts that "the area to be swept harbor[s] an individual posing a danger to the officer or others." *Id.* In *Buie*, the officers made an arrest of a suspected armed robber in the robber's home. *Id.* at 328. The alleged robber was arrested coming out of the basement and the officers went into the basement to see if there were any other people who might pose a danger. *Id.* The Court remanded the case to the district court to

determine if the protective sweep was based on specific facts indicating that the basement harbored an individual posing a danger to those on the arrest scene. *Id.* at 336.

The government argues that narcotics transactions often involve dangerous individuals and that when the officers approached the second floor of the apartment, they did not know if there were any other individuals involved in the drug transaction. We do not think these facts alone, however, give rise to the necessity of a protective search. In the Seventh Circuit cases that have allowed protective searches, the officers knew the individuals involved had weapons or had reason to believe other people were present who might pose a danger to the police officers. *See United States v. Burrows*, 48 F.3d 1011, 1017 (7th Cir. 1995) (protective sweep allowed where defendant had committed violent crime with a firearm, had a history of violent criminal activity and officers were refused entrance but heard movement inside the apartment), *cert. denied*, 515 U.S. 1168 (1995); *United States v. Barker*, 27 F.3d 1287, 1289 (7th Cir. 1994) (protective sweep allowed where officer arrested defendant in home and saw weapons on the premises).

In addition, the government's cited cases are all distinguishable from the instant facts because those cases involved different justifications for the protective search as well as specific facts indicating the suspect was armed and dangerous. *United States v. Dickerson*, 975 F.2d 1245, 1246 (7th Cir. 1992) (defendant was a suspected armed robber and voluntarily allowed the officers into his home), *cert. denied*, 507 U.S. 932 (1993); *United States v. Taylor*, 248 F.3d 506, 510, 514 (6th Cir. 2001) (defendant was a murder suspect who had sold illegal weapons, was part of the Michigan militia, and when officers knocked on his door, they heard scuffling sounds inside suggesting that more than one person was in the apartment), *cert. denied*, 534 U.S. 981 (2001); *United States v.*

*Patrick*, 959 F.2d 991, 994 (D.C. Cir. 1992) (officers knew that defendant was keeping weapons in the apartment and the lessee of the apartment had already given written consent to search the entire apartment). In all of these cases there were specific facts showing that the officers were entering an area that harbored dangerous individuals who were known to have weapons.

Such facts are not present here. Neither of the officers at any time during the surveillance saw any weapons or other indications that Montes or Barerra were violent. While those in the drug trade may often use weapons, this alone is not sufficient to justify a protective sweep. *See Taylor*, 248 F.3d at 514 (agreeing with proposition that a sweep is not justified solely because the subject of drugs is a dangerous one). Further, the arrest took place outside of the apartment in the garage and there was no reason to think the officers were in any immediate danger from the second floor of the apartment. It is too much of a stretch to say that for their own safety, the officers had to go up to the apartment from the garage and conduct a protective sweep of the apartment.

The current situation is not one that *Buie* envisioned. The officers in this case did not going into the home of a dangerous criminal to make an arrest while in possession of specific facts showing that other dangerous individuals might be in the apartment. Asking this Court to hold that whenever an officer arrests a drug offender outside of his apartment, regardless of whether the person is known to be dangerous or is known to have weapons, the officer can then go up to the apartment and make a protective search of the premises would be extending *Buie* farther than is warranted.[11] We decline to

---

[11] We recognize that some circuits have allowed protective sweeps to be made inside the home when the arrest was made outside the home. *See United States v. Arch*, 7 F.3d 1300, 1304 (7th Cir. 1993) (collecting cases), *cert. denied*, 510 U.S. 1139 (1994).

extend the case law and instead hold that in order to conduct a protective search, officers must show specific facts establishing that the indicate the area to be swept harbors individuals who may pose a danger to the arresting officers. Finding no such facts here, we grant Montes' motion to suppress the evidence found in his bedroom during the protective sweep.[12]

## CONCLUSION

For the reasons stated above, Montes' motion to suppress is granted in part and denied in part. (R. 30-1.) We also deny Barrera's motion to suppress and his motion to quash his arrest. (R. 31-1; 31-2.)

ENTERED:

**Judge Ruben Castillo**
**United States District Court**

Dated: July 28, 2003

---

However, these cases are based on the theory that there is an immediate danger to the officers from inside the home that necessitates a protective sweep inside the home for the officer's safety before they can leave. That is not the situation here and there was no indication that any individuals in Montes' apartment posed a danger to the officers outside.

[12] The government also recognizes that protective sweeps are usually only valid when conducted during an arrest. *See United States v. Johnson*, 170 F.3d 708, 716 (7th Cir. 1999) ("the protective sweep in *Buie* [was] conducted pursuant to an arrest for which there was a warrant."); *Arch*, 7 F.3d at 1303 ("*Buie* assumes that the police already are lawfully present in the home to arrest its occupant"). The government does not argue in this case that the search of the apartment was a continuation of Montes' arrest and thus must argue that protective sweeps should be admissible even when the sweep is not made incident to an arrest. We need not address this argument here, however, because the government has not fulfilled its burden of showing that there were "specific and articulable facts" that other dangerous persons were in the apartment.